UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 14-60014-CIV-COHN/SNOW

DAVID B. MURSTEN,

    Plaintiff,

v.

NICK A. CAPORELLA,

    Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant's Motion for Summary Judgment [DE 92] ("Motion"). The Court has reviewed the Motion, Plaintiff's Opposition [DE 124], Defendant's Reply [DE 142], and the supporting materials submitted by the parties, and is otherwise advised in the premises. For the reasons discussed herein, the Court will grant the Motion and enter summary judgment for Defendant.

## I.  BACKGROUND

This case arises from a dispute over an alleged oral agreement between Plaintiff David B. Mursten and Defendant Nick A. Caporella. Mursten is an attorney admitted to practice in Florida. DE 1 (Complaint) ¶ 1. Caporella is the CEO and majority shareholder of National Beverage Corp. ("NBC"), a large soft-drink company valued at almost $1 billion. Id. ¶ 2; DE 92 at 1 n.1. Mursten and Caporella have enjoyed a close relationship spanning several years. Over time, Mursten came to view Caporella as something of a father figure—a sentiment Caporella shared. DE 86-6 & 86-7 (Caporella Deposition) at 102:14–103:2.

Mursten contends that in the predawn hours of September 6, 2010, he and Caporella found themselves in the lobby of Fort Lauderdale's Ritz Carlton hotel. DE 86-3–86-5 (Mursten Deposition) at 191:20–192:4. There, Caporella allegedly proposed an agreement with Mursten involving a foreign company's potential acquisition of NBC. Compl. ¶¶ 8–9. Mursten claims that Caporella wanted him to assist in bringing the acquisition to fruition. Mursten would provide "advice and counsel" to Caporella relating to the acquisition, and would also "perform any other task requested by Caporella, for the benefit of either Caporella or any of his controlled entities." Id. ¶ 9. "[Mursten] would forego any other income-earning opportunity as he would be available on a 24 hour, seven [] day a week basis to assist Caporella." Id.

The agreement also involved generous compensation for Mursten. If the acquisition closed, Mursten would receive the lesser of $10 million or 2% of the amount Caporella personally received in the transaction. Id. ¶ 10. But even if the acquisition fell through, Mursten would receive shares of Caporella's NBC stock worth $4 million, in addition to cash to cover his tax liability on the stock. Id. The agreement has become known in this litigation as the "Dr. Pepper Deal," because the $10 million-2%-$4 million framework for Mursten's compensation echoes a bygone advertising campaign encouraging consumers to drink Dr. Pepper at 10:00 a.m., 2:00 p.m., and 4:00 p.m. Id. ¶ 10 & n.1. Mursten alleges that he accepted the Dr. Pepper Deal, but that Caporella refused to memorialize the agreement in writing. Id. ¶ 11. The Dr. Pepper Deal thus remained an oral agreement, never put to paper.

Mursten began working for Caporella immediately after the time of the alleged agreement. Id. ¶ 13; DE 123 ¶ 1. Mursten performed a wide range of services for

Caporella, and received $117,748 from Caporella, NBC, and NBC's affiliates by way of payments to another company owned by Mursten. DE 123 ¶¶ 1, 11. However, Mursten and Caporella had a falling out in November 2011, which ended their working relationship. DE 122-1 (Mursten Declaration) ¶ 20.

Mursten alleges that the foreign company's acquisition of NBC fell through in mid-2011. Compl. ¶ 20. Mursten thus argues that Caporella owes him $4 million in NBC stock per the terms of the Dr. Pepper Deal, in addition to cash sufficient to cover taxes on the stock transfer. Id. ¶¶ 25–27. However, Caporella has refused to pay. On this basis, Mursten asserts a single cause of action for breach of the Dr. Pepper Deal. Id. ¶¶ 25–28. Caporella, for his part, contends that he never agreed to anything resembling the Dr. Pepper Deal, and that the Deal is a product of Mursten's imagination. Caporella now moves for summary judgment, arguing that the Court should reject Mursten's suit in its entirety.[1]

## II. LEGAL STANDARD

A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party "always bears the initial

---

[1] In opposition to the Motion, Mursten argues that Caporella should be precluded altogether from seeking summary judgment because of statements Caporella's attorneys made at the scheduling conference in this action. DE 124 at 1–2. At the February 13, 2014, scheduling conference, defense counsel told Chief United States Magistrate Judge Barry S. Seltzer: "I think you are probably right that this is not a summary judgment case. . . . There will be a disputed issue of fact." DE 118 at 8:2–5. But upon further discussion, Judge Seltzer noted that the parties did not at that time waive their ability to file dispositive motions, and set a deadline for dispositive motions as part of this action's scheduling order. Id. at 10:4–25; see also DE 19 at 1 (Scheduling Order). The Court rejects Mursten's contention that defense counsel's discussion of the nature of this action at the scheduling conference functions as a waiver of Caporella's ability to seek summary judgment.

responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). To satisfy this burden, the movant must show the court that "there is an absence of evidence to support the nonmoving party's case." Id. at 325.

After the movant has met its burden under Rule 56(a), the burden of production shifts, and the non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). As Rule 56 explains, "[i]f a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact . . . the court may . . . grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P. 56(e)(3). Therefore, the non-moving party "may not rest upon the mere allegations or denials in its pleadings" but instead must present "specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576–77 (11th Cir. 1990). In deciding a summary-judgment motion, the Court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Davis v. Williams, 451 F.3d 759, 763 (11th Cir. 2006).

## III. **DISCUSSION**

This litigation has been particularly contentious, doubtless owing to the once-close personal relationship between the parties. Mursten and Caporella have accused one another of outright fabrication, and they disagree as to whether the events at the heart of this case ever took place. However, even accepting Mursten's contention that he and Caporella agreed to the Dr. Pepper Deal, his single contract claim must fail: as

4

Caporella's attorney, Mursten cannot enforce the oral agreement that would entitle him to a portion of Caporella's stock in NBC.

Rule 4-1.8(a) of Florida's Rules of Professional Conduct addresses an attorney's business transactions with a client. It provides that "[a] lawyer shall not enter into a business transaction with a client . . . unless . . . the transaction and terms . . . are fully disclosed and transmitted in writing to the client . . . ; the client is advised in writing of the desirability of seeking . . . the advice of independent legal counsel on the transaction; and . . . the client gives informed consent, in a writing signed by the client, to the essential terms of the transaction." Fla. R.P.C. 4-1.8(a). The Rule applies not only to business transactions between an attorney and client unrelated to the substance of a representation, but also when the lawyer accepts an interest in the client's business as payment for services. Fla. R.P.C. 4-1.8 comment.

When a lawyer enters into an agreement with a client that violates the requirements of the Rules Regulating the Florida Bar, the agreement may be unenforceable as a matter of public policy. Chandris, S.A. v. Yanakakis, 668 So. 2d 180, 186 (Fla. 1995). Florida's federal courts have specifically found an oral agreement that violates Rule 4-1.8(a) to be unenforceable. See Santiago v. Evans, No. 12-577, 2012 WL 3231025 at *6 (M.D. Fla. June 21, 2012) (Baker, M.J.), adopted, 2012 WL 3231016 (M.D. Fla. Aug. 6, 2012), aff'd, 547 F. App'x 923, 926–27 (11th Cir. 2013) (per curiam); accord Kolb v. Mazzucco, No. CV04400517S, 2005 WL 2362333 at *4–8 (Conn. Super. Ct. Aug. 23, 2005) (applying parallel provision of Connecticut Rules of Professional Conduct to find attorney-client agreement for business property in exchange for legal services unenforceable in absence of writing). Caporella asserts that

5

Mursten was his attorney, and that the alleged Dr. Pepper Deal was a transaction calling for the transfer of an interest in Caporella's business. Caporella thus reasons that Rule 4-1.8(a) applies to the Dr. Pepper Deal, and requires that the agreement be in writing. However, the Dr. Pepper Deal is alleged to be an oral agreement. Caporella concludes that the Dr. Pepper Deal violates the writing requirement of Rule 4-1.8(a), and thus is unenforceable by Mursten as contrary to public policy.

Mursten seeks to avoid the implications of Rule 4-1.8(a) by arguing that the Rule does not apply because he was not Caporella's lawyer. Mursten contends that at all relevant times he "was a non-practicing lawyer, and the record does not indicate an attorney-client relationship between the parties." DE 124 at 13–14. In Mursten's Response to Defendant's Statement of Material Facts, Mursten asserts that "his performance of the [Dr. Pepper Deal] did not constitute the practice of law" and that he "did not provide legal services to [Caporella] during the pertinent times." DE 123 ¶ 3.

Mursten also argues that Caporella himself admitted that "[Mursten] was not acting in the capacity of [his] attorney." DE 124 at 14. In support of this assertion that Caporella admitted Mursten was not his lawyer, Mursten quotes the following passage from Caporella's deposition:

> Q. Is it your testimony that in 2010 you personally hired David Mursten to be your attorney? [Colloquy among counsel]
>
> A. I never said that, sir.
>
> . . .

Id. (quoting Caporella Dep. at 199–201; ellipses in original). However, a review of the deposition transcript shows that the truncated passage Mursten quotes omits important context. The exchange quoted by Mursten reads more fully:

6

> Q. Is it your testimony that in 2010 and 2011 you personally hired David Mursten to be your attorney? [Colloquy among counsel]
>
> A. I never said that, sir.
>
> Q. And in fact you didn't.
>
> A. Mr. Mursten was engaged from the very beginning as a confidant, as a lawyer . . . .
>
> Q. When you said from the beginning, are you talking about years and years ago or are you talking about 2010?
>
> A. I'm talking about from the time that he started with [NBC] . . . .

Caporella Dep. at 200:1–12. Caporella thus testified that Mursten *was* his lawyer. See also id. at 198:23–199:1 ("A. . . . I dealt with him as a counselor and as a lawyer."). The testimony quoted by Mursten goes to when, rather than whether, he provided legal services. See id. at 200:14–16 ("Q. Okay, there is no question that he has had over the years jobs which may have had some legal counsel duties. Did he have any legal counsel duty in 2010 and 2011 . . . ?"). Caporella was unsure of exactly when Mursten provided legal services, guessing that it could have been from 2007 to 2009. Id. at 201:1–6. When asked whether Mursten did any legal work for him after September 6, 2010, Caporella responded: "I don't think so, but I don't know specifically." Id. at 201:7–13.

Unfortunately for Mursten, his own testimony shows unequivocally that he did act as Caporella's lawyer during the term of the alleged Dr. Pepper Deal. At his deposition, Mursten testified that he prepared a document summarizing the work he performed for Caporella during early to mid-2011. Mursten Dep. 232:4–233:15, 235:9–25. This summary—identified at Mursten's deposition as Exhibit 22—included a list of "Legal Matters," which included reviewing and revising an agreement between Caporella and

7

his brother: "[i]dentif[ying] ambiguous provision in an agreement" (DE 96-13 at 4–5; see also Mursten Dep. at 234:20–23); "Draft[ing] Amendment to Eliminate Ambiguity" in the agreement (DE 96-13 at 5); and drafting an affidavit for "key people to attest to the correct meaning of the ambiguous agreement" (id. at 5). Cf. Fla. Bar v. Town, 174 So. 2d 395, 396 (Fla. 1965) ("[T]he practice of law . . . includes . . . the preparation of legal instruments, including contracts . . . ."). At the deposition, Mursten confirmed that he had spent time reviewing the agreement between Caporella and his brother. Mursten Dep. at 234:20–23. See also Compl. ¶ 16(c) ("[S]ervices performed by [Mursten] for Caporella [under the Dr. Pepper Deal] included . . . reviewing an agreement between Caporella and his brother . . . .").

Mursten also testified that he considered himself to be Caporella's lawyer during the term of the Dr. Pepper Deal. For example, in January 2011, Mursten sent an e-mail to an attorney with the law firm of Sullivan & Cromwell LLP, seeking to arrange an appointment for Caporella, in which he wrote: "My name is David Mursten. I am an attorney for Nick A. Caporella, the Chairman and CEO of National Beverage Corp., the fourth largest beverage company in the United States." DE 96-9; see also Mursten Dep. at 206:21–208:20. When defense counsel asked Mursten about this e-mail at his deposition, the following exchange took place:

> Q.  [I]t's your testimony, were you acting as his lawyer or weren't you?
>
> . . .
>
> A.  I think that the E-mail answers your question. It says that I'm an attorney for Nick A. Caporella. . . .

8

Mursten Dep. at 208:10–18.[2]

In review, Caporella and Mursten both testified that Mursten had worked as Caporella's lawyer. Mursten testified—and documentary evidence shows—that he performed legal work for Caporella during the term of the alleged Dr. Pepper Deal. Mursten also held himself out as Caporella's lawyer during the agreement's term. In the face of this substantial evidence that he was Caporella's lawyer, Mursten has attempted to raise an issue of fact by submitting a declaration, in which he states:

> While I am admitted to the Florida Bar . . . I did not act as Caporella's lawyer or the lawyer for NBC or [an NBC affiliate] at any time during the oral agreement; he was a business consulting client and not a legal client. . . .

Mursten Decl. ¶ 12. But Mursten's testimony—not to mention the other evidence in this case—flatly contradicts his averment that he did not act as Caporella's lawyer during the term of the Dr. Pepper Deal. "When a party has given clear answers to unambiguous questions that negate the existence of any genuine issue of material fact, that party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony." Van T. Junkins & Assocs., Inc. v. U.S. Indus., Inc., 736 F.2d 656, 657 (11th Cir. 1984). Because Mursten's statements in his declaration that he did not act as Caporella's lawyer flatly contradict his prior sworn testimony, without explanation, the declaration is insufficient to create an issue of fact regarding whether he was Caporella's lawyer during the term of the alleged Dr. Pepper Deal.

---

[2] Mursten similarly testified in 2012 during his divorce proceedings that he had worked as Caporella's attorney, though he did not say at the time precisely when the attorney-client relationship had existed. DE 142-2 at 5.

Distinct from the issue of whether Mursten performed legal services during the term of the Dr. Pepper Deal, Mursten also contends that he did not have an attorney-client relationship with Caporella when they entered into the agreement. In his declaration, Mursten states that "[a]t the time [of the Dr. Pepper Deal], Caporella and [he] had no attorney-client relationship; [he] was not practicing as a lawyer for any clients." Mursten Decl. ¶ 4.

But again, Mursten's own testimony contradicts his declaration. At his deposition, Mursten was shown a document identified as Exhibit 28, containing a "[p]artial list of activities." See DE 96-17 at 3. Mursten testified that the list of activities was a summary that he prepared to illustrate work he had performed for Caporella in 2010. Mursten Dep. 275:10–24, 276:16–296:10. A number of the activities described in the summary are unambiguously legal in nature, relating to the preparation of legal documents to be filed in a lawsuit involving NBC. See DE 96-17 at 4; Mursten Dep. at 7:22–24, 276:20–277:4. For example, Mursten wrote that he "Coordinated revision of Motion for Summary Judgment," "Reviewed draft Motion," "Identified inconsistencies," "Revised motion to incorporate [Caporella]'s ideas," "Worked with [Caporella] on his Declaration in support of Motion," and "Added other declarations to Motion." DE 96-17 at 4; see also Mursten Dep. at 289:3–9. Mursten reiterated at his deposition that he performed this legal work. Mursten Dep. at 289:3–9, 291:16–25. Crucially, the motion for summary judgment was filed on or about September 3, 2010. See id. at 288:10–289:22; DE 96-17 at 4. In other words, Mursten testified that he was performing legal work for Caporella in an ongoing litigation only days before the September 6, 2010, Dr. Pepper Deal. Mursten's contradictory and unsupported statements in his declaration—that "[a]t the

10

time, Caporella and [he] had no attorney-client relationship" and that he "was not practicing as a lawyer for any clients" (Mursten Decl. ¶ 4)—therefore are entitled to no weight, and fail to create an issue of fact regarding whether he had an attorney-client relationship with Caporella at the time of the Dr. Pepper Deal. See Van T. Junkins & Assocs., Inc., 736 F.2d at 657.

The Court thus finds that Caporella has established that Mursten acted as his attorney, both immediately before and during the term of the alleged Dr. Pepper Deal. Mursten's statements in his declaration that he did not act as a lawyer when he was drafting litigation documents or reviewing contracts not only fail to create an issue for trial, but also raise the question of just what Mursten thinks lawyers do with their days.

It further bears noting that Mursten's denials of an attorney-client relationship with Caporella fail for another reason beyond the fact that they are contradicted by Mursten's own testimony. A recurrent theme in Mursten's Declaration is his talismanic repetition that the Dr. Pepper Deal was to involve his "business services rather than [his] legal services" (Mursten Decl. ¶ 4); that "Caporella and [he] had no attorney-client relationship" (id.); that he "did not act as Caporella's lawyer or the lawyer for NBC . . . at any time during the oral agreement" (id. ¶ 12); and that Caporella "was a business consulting client and not a legal client" (id.). But these assertions are ultimately untethered to any specific facts. Instead, they are no more than unsupported legal conclusions and characterizations of Mursten's relationship with Caporella. Rule 56(c)(4) of the Federal Rules of Civil Procedure provides that an affidavit at the summary judgment stage "must be made on personal knowledge [and] set out facts that would be admissible in evidence." Affidavits containing "conclusory allegations without

11

specific supporting facts have no probative value." Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000). Because Mursten's repeated allegations that he had no attorney-client relationship with Caporella or that he performed no legal services are conclusory statements with no support in specific facts, they are of no help to Mursten in opposing Caporella's request for summary judgment.

Because Mursten was Caporella's lawyer at all relevant times, Rule 4-1.8(a) applies to any business transaction between them, including the alleged Dr. Pepper Deal, which contemplated a transfer of Caporella's stock in NBC to Mursten. See Fla. R.P.C. 4-1.8(a) & comment. The Rule requires business transactions within its scope to be in writing. The Dr. Pepper Deal was an oral contract that was never reduced to writing, thus it violated Rule 4-1.8(a).

The purpose of Rule 4-1.8(a) is to avoid situations where an attorney in a position of trust and confidence overreaches into a client's business or financial affairs. Fla. R.P.C. 4-1.8 comment. The case at bar illustrates that a failure to observe the Rule may result in the breakdown of a client's trust in his attorney, and circumstances in which an attorney's intricate involvement in the business and personal affairs of a client complicate and intensify what would otherwise be an ordinary business dispute. To avoid these and related problems, the Rules of Professional Conduct establish safeguards and requirements, expressed in Rule 4-1.8, that must be followed in the course of business transactions between attorneys and clients. Allowing attorneys to enforce agreements contravening these requirements would run contrary to the public policy considerations leading to the adoption of the Rules in the first place. See Chandris, S.A., 668 So. 2d at 185–86. Accordingly, the Dr. Pepper Deal, which violates

Florida's established public policy relating to transactions between attorneys and clients as stated in Rule 4-1.8(a), is void and unenforceable by Mursten, who as a member of the Florida Bar has a special responsibility both to his clients and the public. See Santiago, 2012 WL 3231025 at *6. Mursten's sole claim for breach of the Dr. Pepper Deal thus fails as a matter of law, and Caporella is entitled to summary judgment.

## IV.  CONCLUSION

Because the Dr. Pepper Deal violated Rule 4-1.8(a), Mursten may not enforce the agreement, and the Court will grant summary judgment for Caporella on the sole claim in this suit. Because Mursten's claim fails as a result of noncompliance with Rule 4-1.8(a), the Court declines to address Caporella's numerous other arguments for summary judgment.[3] It is thereupon

**ORDERED AND ADJUDGED** that Defendant's Motion for Summary Judgment [DE 92] is **GRANTED**. The Court will enter a separate judgment consistent with this ruling. It is further

**ORDERED AND ADJUDGED** that Defendant's Motion to Strike Declaration of Michael Mursten [DE 132] and Defendant's Corrected Motion to Strike Declaration of David B. Mursten [DE 138] are **DENIED** as moot.

---

[3] Because the Court will grant the Motion, the Court will also deny as moot Caporella's motions to strike certain supporting materials filed by Mursten. See DE 132 & 138.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, this 2nd day of October, 2014.

*/s/ James I. Cohn*
JAMES I. COHN
United States District Judge

Copies provided to:
Counsel of record via CM/ECF